**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **CELESTINO SANCHEZ II**, individually, and on behalf of all others similarly situated, | ) ) ) | |
| | ) | **Civil Action  No.**_____ |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| **HIRE VELOCITY, LLC** | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT—CLASS ACTION

Plaintiff, Celestino Sanchez II ("Plaintiff"), individually and on behalf of all

others similarly situated, complains and alleges as follows against Defendant, Hire

Velocity, LLC, ("Defendant" or "Hire Velocity") based on personal knowledge, on

the investigation of his counsel, and on information and belief as to all other matters:

### INTRODUCTION

1.     This is a civil action seeking monetary damages and injunctive and

declaratory relief from Defendant, arising from its failure to safeguard certain

Personally Identifying Information[1] ("PII") and other sensitive, non-public financial

---

[1] The Federal Trade Commission defines "personally identifying information" as
"any name or number that may be used, alone or in conjunction with any other
information, to identify a specific person," including, among other things, "[n]ame,
Social Security number, date of birth, official State or government issued driver's

information (collectively, "Personal Information") of thousands of its prospective, current, and former clients, resulting in Defendant's network systems being infiltrated on or around February 17, 2025, and the PII therein, including of Plaintiff and the proposed Class Members, being disclosed, stolen, compromised, and misused, causing widespread and continuing injury and damages.

2.     On information and belief, on or around February 17, 2025, Defendant's file servers were "hacked" and unauthorizedly accessed, resulting in the theft of Personal Information of Plaintiff and the Class Members, including names and Social Security Numbers (the "Data Breach").[2]

3.     As explained below, Plaintiff and Members of the Class have suffered significant injury and damages due to the Data Breach permitted to occur by Defendant, and the resulting publication of their PII on the dark web, misuse of their PII, monetary damages including out-of-pocket expenses, including those associated with the reasonable mitigation measures they were forced to employ, and other damages. Plaintiff and the Class also now forever face an amplified risk of *further* misuse, fraud, and identity theft due to their sensitive PII being circulated and traded on the dark web as a result of the tortious conduct of Defendant.

---

license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] *See:* Hire Velocity Notice of Data Breach to Plaintiff Sanchez II, attached as **Exhibit A**.

4.     On behalf of himself and the Class preliminarily defined below, Plaintiff brings causes of action for negligence, negligence *per se*, breach implied contractual duties, unjust enrichment, and bailment. Plaintiff seeks damages and injunctive and declaratory relief arising from Defendant's failure to adequately protect his highly sensitive PII.

## PARTIES

5.     Plaintiff Celestino Sanchez II is a natural person and citizen of the state of Pennsylvania, residing in Philadelphia, Pennsylvania, where he intends to remain.

6.     Defendant, Hire Velocity, LLC, is a limited liability company organized and existing under the laws of the state of Florida, with a principal place of business located at 375 Northridge Rd. Suite 270, Atlanta, GA, 30350, USA.

## JURISDICTION AND VENUE

7.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (i) there are more than one hundred (100) Class Members; (ii) the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs; and (iii) some Class Members are citizens of states different than Defendant.

8.     This Court has personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in this State; it maintains its principal place of business and

headquarters in Georgia; and committed tortious acts in Georgia.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in this district, and/or a substantial part of property that is the subject of this action is situated herein.

## FACTUAL ALLEGATIONS

*Hire Velocity, LLC*

10.    Defendant is a talent acquisition and professional search firm that specializes in "providing top-tier talent strategy and recruitment process outsourcing services designed to transform your business."[3] Defendant states it partners "with clients across diverse industries to tackle recruiting challenges and deliver sustained results."[4]

11.    As part of its business, Defendant receives, collects, and maintains the highly sensitive PII of its current and former clients. In doing so, Defendant implicitly promises to safeguard their PII.

12.    After collecting its clients' PII, Defendant maintains the PII in its computer systems. On information and belief, Defendant maintains former clients'

---

[3] *About Us,* HIRE VELOCITY, https://www.hirevelocity.com/about-us/  (last visited May 28, 2025).
[4] *Hire Velocity,* LINKEDIN, https://www.linkedin.com/company/hire-velocity/about/ (last visited May 28, 2025).

PII for years after their relationship is terminated.

13.    In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies as well as state law and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

14.    Indeed, Defendant understood the importance of adequate cybersecurity measures, declaring in its Privacy Policy that "[w]e value your trust in providing us your Personal Information, thus we are striving to use commercially acceptable means of protecting it. We have implemented technology, security policies and measures to protect the Personal Information that we have under our control from unauthorized access, improper use, alteration, unlawful or accidental destruction and accidental loss."[5]

15.    Thus, Defendant understood the need to protect its current and former clients' PII and prioritize its data security.

16.    Despite recognizing its duty to do so, on information and belief, Defendant has not implemented reasonably cybersecurity safeguards or policies to protect clients' PII or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities

---

[5] *Privacy Policy,* HIRE VELOCITY,    https://www.hirevelocity.com/privacy-policy/ (last visited May 28, 2025).

in its systems for cybercriminals to exploit and gain access to the PII in its care.

***The Data Breach***

17.    Plaintiff received a letter from Defendant informing him that his PII was involved in the Data Breach ("Breach Notice").[6]

18.    As a condition of receiving services or employment from Defendant, clients were required to disclose their PII to Defendant, including but not limited to, names and Social Security numbers. Defendant used that PII to facilitate the provision of services to its clients.

19.    On information and belief, Defendant collects and maintains former and current clients' unencrypted PII in its computer systems.

20.    In collecting and maintaining the PII, Defendant implicitly agrees it will safeguard the data using reasonable means according to its internal policies and federal law.

21.    According to the Breach Notice, Defendant claims that "[o]n April 15, 2025, we learned that personal information of certain individuals was accessed without authorization."[7] Due to Defendant's obfuscating information, the precise dates on which the Data breach occurred and how long cybercriminals had access to Plaintiff's and the Class's most sensitive information is unclear.

---

[6] Ex. A.

[7] Ex. A.

22.    Defendant further states that the unauthorized access was "the result of a suspicious event we first learned of on or about February 17, 2025."[8] Defendant states it launched an investigation, which revealed that "certain files may have been access or acquired without authorization."[9] The files involved in the breach included names and Social Security numbers.[10]

23.    In other words, the Data Breach investigation revealed Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to access files containing a treasure trove of its current and former clients' highly private information.

24.    Additionally, Defendant admitted that PII was actually stolen during the Data Breach, confessing that the information was not just accessed, but was "acquired" from its network.[11]

25.    Through its inadequate security practices, Defendant exposed Plaintiff's and the Class's PII for theft and sale on the dark web.

26.    On or about May 16, 2025–about a month after Defendant states it "learned of" the theft of PII– Defendant finally began notifying Plaintiff and Class Members about the Data Breach.

---

[8] *Id*.
[9] *Id*.
[10] *Id*.
[11] *Id*.

27.    Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

28.    And when Defendant did notify Plaintiff and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, informing Plaintiff it has "secured the services of Kroll to provide identity monitoring…Kroll is a leader in risk mitigation and response and their team has extensive experience helping people who have sustained an unintentional exposure of confidential data."[12]

29.    Despite its duties and alleged commitments to safeguard PII, Defendant did not in fact follow industry standard practices in securing PII, as evidenced by the Data Breach.

30.    Defendant has offered 12 months of complimentary credit monitoring services to victims, which does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves PII that cannot be changed, such as Social Security numbers.

31.    Even with credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

---

[12] *Id.*

32.    Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

33.    On information and belief, Defendant failed to adequately train and supervise its IT and data security agents and employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over the PII in its care. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII.

***Lynx Claims Credit for the Data Breach***

34.    Worryingly, the cybercriminals that obtained Plaintiff's and Class members' PII appear to be the notorious ransomware group "Lynx"[13]—a ransomware group that uses Ransomware-as-a-Service (RaaS) to create and disseminate attacks across industries such as finance, architecture, and manufacturing sectors.[14]

---

[13] *Hire Velocity*, BREACHSENSE, https://www.breachsense.com/breaches/hire-velocity-data-breach/ (lasted visited May 28, 2025).

[14] Orlaith Traynor, *Lynx Ransomware: Double Extortion, Ethics & Affiliate Payouts*, Cyber Angel (Mar. 28, 2025), https://cybelangel.com/lynx-ransomware-double-extortion/.

35.    Lynx employs "affiliates" who receive an 80% share of ransom proceeds, handle all negotiations, and maintain control over the "ransom wallet."[15] Lynx also offers additional services, such as a call center to harass victims and advanced storage solutions for high-performing affiliates."[16]

36.    On or around February 27, 2025, Lynx claimed responsibility for the Data Breach, posting that it had hacked Defendant in the "leaks" page of its dark web website."[17]

---

[15] *Id*.

[16] *Id*.

[17] Screen shots regarding the Data Breach were obtained from RansomLook, an open source project that tracks ransomware related posts from various dark web sites. *See About RansomLook*, RANSOMLOOK, https://www.ransomlook.io/about (last visited May 28, 2025).



37.    Lynx' post contained a link stating "Go to the publication" and had a "views" counter that stated that the post had been viewed 17,999 times.

38.    Thus, on information and belief, Plaintiff's and the Class's PII has already been published on the dark web.

39.    In its Breach Notice, Defendant did not inform Plaintiff and the Class

that their PII had been stolen by Lynx and disseminated on the dark web.

40.    Defendant has provided no public information regarding a ransom demand or payment regarding the Data Breach at issue here.

41.    On information and belief, even if Defendant paid a ransom demand, there is no guarantee that the data Lynx stole will be deleted.[18] The stolen PII is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[19]

42.    Further, there have been cases where the links that lead to compromised files, while removed from the group who received the ransom payment's dark web website, remain available on the servers used by other hackers, even after the demand is met.[20]

43.    And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential

---

[18] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.

[19] *Id*.

[20] *Dedicated Leak Sites (DLS): Here's what you should know*, Group-IB, https://www.group-ib.com/resources/knowledge-hub/dedicated-leak-sites/ (last visited May 28, 2025).

stuffing attacks, phishing attacks, [or] hacking."[21]

***The Data Breach was Foreseeable by Defendant***

44.    Plaintiff's and the proposed Class Members' PII was provided to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access. By failing to do so, Defendant put all Class Members at risk of identity theft, financial fraud, and other harms.

45.    Defendant tortiously failed to take the necessary precautions required to safeguard and protect the PII of Plaintiff and the Class Members from unauthorized disclosure. Defendant's actions represent a flagrant disregard of Plaintiff' and the other Class Members' rights.

46.    Plaintiff and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing PII and the critical importance of providing adequate security for that information.

47.    Cyber-attacks against companies such as Defendant are targeted and frequent. Indeed, according to UpGuard, "[c]ybercriminals know that tech

---

[21] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

companies often have weaker data protection and overall cybersecurity measures than highly-regulated industries, like healthcare and finance. Instead of targeting these organizations directly for their valuable data, they focus their efforts on the poor data security often found in the first link of the supply chain – tech vendors that store and manage significant amounts of data from these industries."[22]

48.    According to the Identity Theft Resource Center's January 2025 report for 2024, the "number of data compromises reported in 2024 totaled 3,158, 44 events short of 2023's record high of 3,202." [23]

49.    The report further detailed that data compromises are preventable, stating, "attacks that could have been blocked with the adoption of cybersecurity best practices, including Zero Trust cybersecurity practices, improved software development processes like those recommended by the U.S. Cybersecurity & Infrastructure Security Agency (CISA), practices recommended by the National Institute of Standards and Technology (NIST) and improved testing, monitoring and patching."[24]

---

[22] Catherine Chipeta, UPGUARD, *5 Ways Tech Companies Can Prevent Data Breaches* (updated Mar. 2, 2023) https://www.upguard.com/blog/how-tech-companies-can-prevent-data-breaches.

[23] *See DBR: Identity Theft Resource Center 2024 Data Breach Report*, ITRC (Jan. 28, 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report/.

[24] *Id.*

***Defendant failed to adhere to FTC guidelines***

50.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[25] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of Personal Information.

51.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[26] The FTC declared that, *inter alia*, businesses must:

      a.   protect the personal customer information that they keep;

      b.   properly dispose of personal information that is no longer needed;

      c.   encrypt information stored on computer networks;

      d.   understand their network's vulnerabilities; and

      e.   implement policies to correct security problems.

---

[25] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Sep. 2, 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited May 28, 2025).
[26] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Sep. 28, 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

52.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

53.    Furthermore, the FTC explains that companies must:

    a.   not maintain information longer than is needed to authorize a transaction;

    b.   limit access to sensitive data;

    c.   require complex passwords to be used on networks;

    d.   use industry-tested methods for security;

    e.   monitor for suspicious activity on the network; and

    f.   verify that third-party service providers use reasonable security measures.

54.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

55.    In short, Defendant's failure to use reasonable and appropriate

measures to protect against unauthorized access to its current and former consumers' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant failed to adhere to industry standards***

56.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

57.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

58.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01,

PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

59.     These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

60.     In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

      a.   Control who logs on to your network and uses your computers and other devices;

      b.   Use security software to protect data;

      c.   Encrypt sensitive data, at rest and in transit;

      d.   Conduct regular backups of data;

      e.   Update security software regularly, automating those updates if possible;

      f.   Have formal policies for safely disposing of electronic files; and old devices; and

      g.   Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their

personal risk in addition to their crucial role in the workplace.[27]

61.    Further still, CISA makes specific recommendations to organizations to guard against cybersecurity attacks, including (1) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (2) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (3) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[28]

---

[27] *Understanding The NIST Cybersecurity Framework*, FED. TRADE COMM'N (Sep. 2, 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited May 28, 2025).

[28] *Shields Up: Guidance for Organizations*, CISA, https://www.cisa.gov/shields-guidance-organizations  (last visited May 28, 2025).

*Plaintiff and the Class Members were significantly injured by the Data Breach*

62.     Plaintiff and members of the proposed Class have suffered injury and damages from the exfiltration and misuse of their PII that can be directly traced to Defendant, that has occurred, is ongoing, and/or imminently will occur.

63.     As stated prior, in the Data Breach, unauthorized cybercriminals were able to access and acquire Plaintiff's and the proposed Class Members' PII, which is now available to be imminently used for fraudulent purposes or has been sold for such purposes, causing widespread injury and damages.

64.     The ramifications of Defendant's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

65.     Because Defendant failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the Class Members have suffered, will imminently suffer, or are at an increased risk of suffering:

      a.    Fraudulent misuse of PII;

      b.    The loss of the opportunity to control how PII is used;

c.   The diminution in value of their PII;

d.   The compromise and continuing publication of their PII;

e.   Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

f.   Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

g.   Delay in receipt of tax refund monies;

h.   Increase in spam texts and telephone calls;

i.   Unauthorized use of stolen PII; and

j.   The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

66.    Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

67.    There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in

victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.[29]

68.    The FTC recommends that identity theft victims take time and effort intensive or costly steps to protect their personal and financial information after a data breach, including contacting the company where the fraud occurred and asking them to close or freeze accounts and changing login information; contacting one of the credit bureaus to place a fraud alert on credit files (consider an extended fraud alert that lasts for 7 years if someone steals their identity); reviewing their credit reports;  seeking a credit freeze; correcting their credit reports; and other steps such

---

[29] *See* Gaetano DiNardi, *How Bad Is Identity Theft? Is It Serious?*, AURA (December 14, 2022), https://www.aura.com/learn/dangers-of-identity-theft#:~:text=Fraudsters%20can%20open%20new%20accounts,to%20repair%20your%20credit%20score.

as contacting law enforcement and reporting the identity theft to the FTC.[30]

69.    Identity thieves use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud—just as occurred here—phone or utilities fraud, and bank/finance fraud.

70.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

71.    In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive other services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

72.    The value of sensitive information is axiomatic; one need only consider the value of Big Data in corporate America, or that the consequences of cyber theft include heavy prison sentences. Even the obvious risk to reward analysis of cybercrime illustrates beyond doubt that PII has considerable market value.

73.    It must also be noted there may be a substantial time lag–measured in

---

[30] *See* Federal Trade Commission, available at https://www.identitytheft.gov/Steps (last accessed May 6, 2024).

years–between when harm occurs versus when it is discovered, and also between when PII and/or financial information is stolen and when it is used.

74.    PII are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

75.    Where the most PII belonging to Plaintiff and Class Members was accessible from Defendant's network, there is a strong probability that entire batches of stolen information have been dumped on the black market, and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and the Class Members must vigilantly monitor their financial accounts for many years to come.

76.    Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud.[31]

77.    For example, the Social Security Administration has warned that

---

[31] *See Identity Theft and Your Social Security Number*, U.S. SOCIAL SECURITY ADMINISTRATION, Publication No. 05-10064 (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[32] Each of these fraudulent activities is difficult to detect. An individual may not know that his or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

78.    Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[33]

79.    Another example of criminals using PII for profit is the development of "Fullz" packages.

---

[32] *See id.*

[33] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

80.    Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as Fullz packages.

81.    The development of Fullz packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

82.    Defendant knew or should have known of these harms which would be caused by the Data Breach it permitted to occur, and strengthened its data systems accordingly.

***Plaintiff's Experience***

83.    Plaintiff Sanchez II received Defendant's Data Breach Notice on or

around late May 2025, informing him that his PII was compromised in the Data Breach, including at least his name and Social Security number.

84.     In the wake of the Data Breach, Plaintiff contacted Defendant multiple times via telephone in an attempt to understand the scope of the breach and how his information was impacted. He has not received any response.

85.     As a result, Plaintiff was injured by Defendant's Data Breach when his PII was compromised.

86.     Defendant used Plaintiff's PII to facilitate its business.

87.     In receiving Plaintiff's PII, Defendant promised it would employ reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

88.     Plaintiff reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII.

89.     Plaintiff does not recall ever learning that his Social Security number or financial information were compromised in a data breach incident—other than the breach at issue here.

90.     And in the aftermath of the Data Breach, Plaintiff has suffered from a spike in scam and phishing emails, calls, and texts. On information and belief, Plaintiff's phone number and email address were compromised in the Data Breach

91.     Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

92.     Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

93.     Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

94.     Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

95.     Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

96.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

97.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

98.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

99.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

## CLASS ACTION ALLEGATIONS

100.    Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Fed. R. Civ. Proc. 23. The Class is preliminarily defined as:

> All individuals residing in the United States whose PII was compromised in the Data Breach discovered by Defendant in February 2025, including all those individuals who received notice of the Data Breach.

101.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

102.    Plaintiff reserves the right to amend the class definition.

103.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide

bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

104. <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

105. <u>Numerosity</u>. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes hundreds of members.

106. <u>Typicality</u>. Plaintiff's claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

107. <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

108. <u>Commonality and Predominance</u>. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class members—for which a class wide

proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

a.   if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b.   if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.   if Defendant were negligent in maintaining, protecting, and securing PII;

d.   if Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

e.   if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f.   if Defendant's Breach Notice was reasonable;

g.   if the Data Breach caused Plaintiff and the Class injuries;

h.   what the proper damages measure is; and

i.   if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

109.   Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this

controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

110. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

111. Plaintiff and the Class (or their third-party agents) entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

112. Defendant owed a duty of care to Plaintiff and Class members because it was foreseeable that Defendant's failure—to use adequate data security in

accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

113.   Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

114.   Defendant owed these duties to Plaintiff and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class members' PII.

115.   Defendant owed—to Plaintiff and Class members—at least the following duties to:

> a.   exercise reasonable care in handling and using the PII in its care and custody;
>
> b.   implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;
>
> c.   promptly detect attempts at unauthorized access;
>
> d.   notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PII.

116.    Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

117.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

118.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

119.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

120.   Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class members' PII.

121.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class members' sensitive PII.

122.   Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

123.   The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII —whether by malware or otherwise.

124.    PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class members' and the importance of exercising reasonable care in handling it.

125.    Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

126.    Defendant breached these duties as evidenced by the Data Breach.

127.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class members' PII by:

> a.    disclosing and providing access to this information to third parties and
>
> b.    failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

128.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class members which actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

129.   Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class members' injuries-in-fact.

130.   Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

131.   As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

132.   And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by Lynx on the dark web.

133.   Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were

caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *per se*
### (On Behalf of Plaintiff and the Class)

134.   Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

135.   Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

136.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff's and the Class Members' sensitive PII.

137.   Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

138.   Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry

standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

139.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

140.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

141.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

142.    Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

143.  As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

144.  Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

145.  Plaintiff and Class members either directly contracted with Defendant or Plaintiff and Class members were the third-party beneficiaries of contracts with Defendant.

146.  Plaintiff and Class members (or their third-party agents) were required to provide their PII to Defendant as a condition of receiving products and/or services provided by Defendant. Plaintiff and Class members (or their third-party agents) provided their PII to Defendant or its third-party agents in exchange for Defendant's products and/or services.

147.  The contracts entered into by Plaintiff's and Class members' agents (for example, their employers), were made for the direct benefit of Plaintiff and the Class. Specifically, Plaintiff's and Class members' third party agents entered into contracts with Defendant to products and/or services for Plaintiff and Class members.

148.  Plaintiff and Class members (or their third-party agents) reasonably

understood that a portion of the funds they paid Defendant would be used to pay for adequate cybersecurity measures.

149.    Plaintiff and Class members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

150.    Plaintiff and the Class members (or their third-party agents) accepted Defendant's offers by disclosing their PII to Defendant or its third-party agents in exchange for products and/or services.

151.    In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

152.    Upon information and belief, in its Privacy Policy or other internal policies, Defendant represented that they had a legal duty to protect Plaintiff's and Class Member's PII.

153.    Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII.

154.    After all, Plaintiff and Class members (or their third-party agents) would not have entrusted their PII to Defendant (or their third-party agents) in the absence of such an agreement with Defendant.

155.    Plaintiff and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

156.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

157.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

158.    Defendant materially breached the contracts it entered with Plaintiff and Class members (or their third-party agents) by:

> a.    failing to safeguard their information;
>
> b.    failing to notify them promptly of the intrusion into its computer systems that compromised such information.
>
> c.    failing to comply with industry standards;
>
> d.    failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.    failing to ensure the confidentiality and integrity of the electronic

PII that Defendant created, received, maintained, and transmitted.

159.    In these and other ways, Defendant violated its duty of good faith and

fair dealing.

160.    Defendant's material breaches were the direct and proximate cause of

Plaintiff's and Class members' injuries (as detailed *supra*).

161.    And, on information and belief, Plaintiff's PII has already been

published—or will be published imminently—by cybercriminals on the Dark Web.

162.    Plaintiff and Class members (or their third-party agents) performed as

required under the relevant agreements, or such performance was waived by

Defendant's conduct.

### FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

163.    Plaintiff incorporates by reference all other paragraphs as if fully set

forth herein.

164.    This claim is pleaded in the alternative to the breach of implied contract

claim.

165.    Plaintiff and Class members (or their third-party agents) conferred a

benefit upon Defendant. After all, Defendant benefitted from (1) their payment, and

(2) using their PII to facilitate its provision of employee-benefit related products

and/or services.

166.   Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class members (or their third-party agents).

167.   Plaintiff and Class members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

168.   Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII.

169.   Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

170.   Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class members' (1) payment, and (2) PII because Defendant failed to adequately protect their PII.

171.   Plaintiff and Class members have no adequate remedy at law.

172.   Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

**FIFTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

173.   Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

174.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

175.   In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

176.   Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.   Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

- 45 -

b.   Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c.   Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d.   Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiff and Class members.

177.   The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

178.   If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

179.   And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class members' injuries.

180.   If an injunction is not issued, the resulting hardship to Plaintiff and Class members far exceeds the minimal hardship that Defendant could experience if

an injunction is issued.

181.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class members, and the public at large.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, CELESTINO SANCHEZ II, individually and on behalf of all others similarly situated, the Class as heretofore identified, respectfully prays this Honorable Court for judgment as follows:

A.    Certification for this matter to proceed as a class action on behalf of the proposed Class under Fed. R. Civ. Proc. 23;

B.    Designation of Plaintiff as Class Representatives and designation of the undersigned as Class Counsel;

C.    Actual damages in an amount according to proof;

D.    Injunctive or declaratory relief;

E.    Pre- and post-judgment interest at the maximum rate permitted by applicable law;

F.    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

G.    For attorneys' fees under the common fund doctrine and all other

applicable law; and

H.    Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, hereby demand a trial by jury pursuant to Fed. R. Civ. Proc. 38(b) on all claims so triable.

Dated: May 28, 2025                    Respectfully submitted,

By: */s/ Casondra Turner*
    Casondra Turner
    GA Bar No. 418426
    **MILBERG COLEMAN BRYSON
    PHILLIPS GROSSMAN PLLC**
    800 S. Gay Street, Suite 1100
    Knoxville, TN 37929
    Telephone: (866) 252-0878
    Fax: (771) 772-3086
    cturner@milberg.com

    Raina C. Borrelli*
    **STRAUSS BORRELLI PLLC**
    One Magnificent Mile
    980 N. Michigan Avenue, Suite 1610
    Chicago, Illinois 60611
    T: (872) 263-1100
    F: (872) 263-1109
    raina@straussborrelli.com

    *Pro hac vice forthcoming*

    *Attorneys for Plaintiff and Proposed Class*